# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# SAVANNAH DIVISION

SHERRY MICHELLE MILLS, )
                               )
    Plaintiff, )
                               )
v. )    Case No. CV413-044
                               )
CAROLYN W. COLVIN, )
*Commissioner of Social Security*, )
                               )
    Defendant. )

## REPORT AND RECOMMENDATION

Sherry Mills, a 48-year-old woman whose longest job was as an assistant manager in a retail setting, applied for a period of disability and disability insurance benefits with an onset date of May 4, 2007. (Tr. 38-40.) She reported that she was suffering from bursitis of the right knee, obesity, asthma, and bipolar disorder/schizophrenia. (*Id.*) Her application was denied both initially and on reconsideration. (Tr. 38.) An Administrative Law Judge ("ALJ") conducted a hearing and denied benefits. (Tr. 38-51.) The Appeals Council denied her request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-4.) She then filed a complaint for judicial review

in this Court, contending that the ALJ erred in reaching his determination. (Doc. 1.) The Court agrees that the ALJ's decision is not supported by substantial evidence and finds that the case must be remanded.

## I.  STANDARD OF REVIEW

Affirmance of the Commissioner's decision is mandatory if her conclusions are supported by substantial evidence and based upon an application of correct legal standards.  42 U.S.C. § 405(g); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002); *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997).  "Substantial evidence is something more than a mere scintilla, but less than a preponderance." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (quotation marks and citations omitted).  It "is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) (quotation marks and citations omitted).  If substantial evidence supports the decision, the Court will affirm "[e]ven if the evidence preponderates against the Commissioner's findings." *Id.* at 1158-1159.  This Court cannot

substitute its judgment for that of the Commissioner. *Barnes v. Sullivan*, 932 F.2d 1356, 1357-1358 (11th Cir. 1991).

The burden of proving disability lies with the claimant. 20 C.F.R. § 404.1512; *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). To determine whether she has met the burden, the Court looks to the five-step evaluation process set forth in the Social Security Regulations. 20 C.F.R. § 416.920; *Dixon v. Astrue*, 312 F. App'x 227, 227-28 (11th Cir. 2009); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). At step one, the claimant must prove that she has not engaged in substantial gainful activity. *Jones*, 190 F.3d at 1228. At step two, she must demonstrate a severe impairment or combination of impairments. *Id.* Then, at step three, if the claimant's impairment meets or equals a listed impairment, she is automatically found disabled. *Id.* If not, she must advance to step four, which requires her to prove an inability to perform past relevant work. *Id.* At that step the ALJ assesses "the claimant's residual functional capacity ('RFC')" and "ability to return to [her] past relevant work." *Phillips v. Barnhart*, 357 F.3d 1232, 1238 (11th Cir. 2004). "[T]he regulations define RFC as that which an individual is still able to do despite the limitations caused by his or her impairments." *Id.* (citing

20 C.F.R. § 404.1545(a)); *Moore v. Comm'r of Soc. Sec.*, 478 F. App'x 623, 624 (11th Cir. 2012). If she cannot perform past relevant work, stage five shifts the burden to the Commissioner to show that "there is other work available in significant numbers in the national economy that the claimant is able to perform." *Moore*, 478 F. App'x at 624.

## II.  MEDICAL EVIDENCE

All of Mills' claims relate to the ALJ's evaluation of her mental condition. (Doc. 1 at 11.) The Court will therefore recount the medical evidence relating to her mental disability but will not go into detail as to her other impairments.

The first documented mental health episode occurred on March 29, 2007, when she was admitted to Candler Hospital complaining of auditory hallucinations "telling her to scream, holler and hurt herself."[1] (Tr. 412.) Later that evening, after her transfer to another room, hospital staff discovered that she was missing. (Tr. 411.) The

[1] Mills tends to make frequent use of hospital emergency services. Prior to March 29, 2007, she made several emergency visits to Candler Hospital. On February 4, she arrived and complained of severe shoulder pain. (Tr. 419.) She returned on February 26 complaining of knee pain, which was diagnosed as bursitis. (Tr. 417-18.) On March 18, she arrived complaining of chest pain and shortness of breath caused by asthma. (Tr. 414.) There are many other instances throughout the record, but the Court will limit references in text to those visits prompted by mental health issues.

authorities were called and asked to locate her, but the next day she returned. (Tr. 410-11.) "She confirmed auditory hallucinations directing her to kill herself. She is depressed, tearful, and suicidal at this point." (*Id.*) She was diagnosed with depression and acute psychosis and referred to Gateway Behavioral Health for further treatment. (*Id.*) The Gateway records appear to be missing from this record,[2] but a later outpatient follow-up at the Savannah Area Behavioral Health Collaborative ("SABHC") shows that the Gateway medical staff prescribed her various psychotropic medications,[3] stabilized her, and referred her to SABHC for further care. (Tr. 436.)

On April 5, 2007, she began treatment at SABHC. (Tr. 435-36.) She reported that her admission at Candler was prompted by auditory hallucinations commanding her to slit her wrists and jump off the Talmadge Bridge. (Tr. 444.) She explained that she had a history of

---

[2] The ALJ says she was discharged from Georgia Regional, not Gateway. (Tr. 40.) According to Mills and her treating physician's assistant at SABHC, she was referred from Gateway, not Georgia Regional. (Tr. 435, 436, & 448 (discharged from Gateway CSU).)

[3] She was prescribed Klonopin, a benzodiazepine used to treat seizure and panic disorders Risperdal, an antipsychotic used to treat schizophrenia and bipolar disorders, and Celexa, a selective serotonin reuptake inhibitor ("SSRI") used to treat depression. National Library of Medicine, *available at* http://www.ncbi.nlm. nih.gov/pubmedhealth (last visited Apr. 23, 2014).

depression and had attempted suicide many years back, which led to her admission to another mental health hospital and a prescription for Paxil, though the records from that hospitalization are also absent from the record.[4] (*Id.*) She reported that she had been diagnosed with major depression with psychotic features. (Tr. 435.) SABHC filled her prescriptions and scheduled for her a comprehensive evaluation. (*Id.*; tr. 444-48.) At that evaluation, conducted on April 27, 2007, a physician's assistant confirmed the diagnosis of major depression with psychotic features and noted that because claimant was still depressed and paranoid, her anti-depressant was changed from Celexa to Effexor.[5] (Tr. 448.) It was recommended that she continue weekly group counseling sessions. (*Id.*)

In June 2007, Mills reported that she was still experiencing command hallucinations, lethargy, and depression, so she was switched

---

[4] Paxil is an SSRI used to treat depression, obsessive-compulsive disorder, panic disorder, social anxiety, and several other conditions. National Library of Medicine, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011606/ (last visited Apr. 23, 2014).

[5] Effexor is another anti-depressant, but it works on both serotonin and norepinephrine. It is thus classified as a serotonin and norepinephrine reuptake inhibitor ("SNRI"). National Library of Medicine, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0012623/ (last visited Apr. 23, 2014).

from Risperdal to Seroquel.[6]  (Tr. 453, 513.)  After the switch, she reported that her hallucinations were cut in half.  (Tr. 512.)  In October, however, she again reported suicidal ideation and hallucinations but explained that she had been off of her medications for several weeks and had only recently restarted them.[7]  (Tr. 509.)

On December 18, 2007, Mills returned to SABHC complaining of serious paranoia, which worsened at night.  (Tr. 508.)  She also reported her first visual hallucinations, stating that she saw shadows entering her room.  (*Id.*)  The physician's assistant noted that Mills appeared to be anxious and paranoid.  (*Id.*)  She was taken off of Seroquel and placed on Zyprexa.[8]  (*Id.*; tr. 523.)  Later, the Zyprexa was discontinued and Seroquel was restarted.  (Tr. 522.)

A few months later, on February 15, 2008, Mills visited Memorial Health University Medical Center complaining of suicidal ideation. (Tr.

---

[6] Seroquel is another antipsychotic used to schizophrenia, and it is also particularly effective at treating the mania characteristic of bipolar disorder. National Library of Medicine, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011909/ (last visited Apr. 17, 2014).

[7] Mills explained at one point that she had difficulty obtaining her medication and was largely relying on free samples.  (Tr. 517.)

[8] Zyprexa is an antipsychotic given via injection to treat schizophrenia and bipolar disorder.  National Library of Medicine, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011473/ (last visited Apr. 17, 2014).

640.) She told the hospital's emergency room staff that she kept hearing voices telling her to slit her wrists.[9] (Tr. 640.) She was sent to Memorial's Clark Center for a psychological evaluation. (Tr. 641.) She appeared to be very tired but reported that she was compliant with her medications of Effexor, Seroquel, and Klonopin. (*Id.*) Based on her demeanor and the fact that Mills was hypotensive, the dictating physician, Dr. Jennifer Pavlo, M.D., was concerned that Mills had attempted suicide by overdosing on Klonopin, but Mills denied it. (*Id.*) Her urine screen, however, was positive for benzodiazepines. (Tr. 645.) She was admitted for observation and a psychiatric consultation. (Tr. 645.) They released her the next day, transferring her to Georgia Regional Hospital. (Tr. 650.)

Georgia Regional observed her for a short time but did not admit her. (Tr. 502.) After a "brief assessment" by Dr. Rebecca Payne, M.D., Mills was diagnosed as bipolar and discharged into her daughter's care. (*Id.*; tr. 1058.) She was scheduled for a follow-up appointment at SABHC two days later. (Tr. 504.) On February 20, 2008, she began Geodon,

---

[9] She also reported that she had caused a grease fire in her kitchen earlier in the day and thought she may have inhaled some fumes. (Tr. 640.)

another anti-psychotic, and it appears that Klonopin was discontinued.[10] (Tr. 521.) By now, her diagnosis had shifted from depression to schizoaffective disorder, bipolar type.[11] (Tr. 520.)

She had another episode on September 29, 2008, when she attempted suicide by overdosing on Seroquel. (Tr. 572.) Her daughter found her and brought her to the hospital, but Mills appeared to be ambivalent about the rescue and indicated that she still wanted to die. (*Id.*) She reported that the attempt was prompted by the termination of a long-term relationship. (*Id.*) She was taken to the ICU, intubated, and stabilized medically, as she had experienced respiratory failure. (*Id.*; 670.) She was transferred from the ER to the Clark Center, where she stayed for several days until achieving "psychiatric stabilization." (Tr. 672.) Dr. Stephens Yost, M.D., a psychiatrist with the Clark Center, diagnosed Mills with schizoaffective disorder, bipolar type. (Tr. 572.) According to Yost, Mills reported that she was not compliant with her

---

[10] Geodon treats schizophrenia and certain problems caused by bipolar disorder, including excessive movement, tension, and anxiety. National Library of Medicine, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0001945/ (last visited Apr. 23, 2014).

[11] Schizoaffective disorder is characterized by having symptoms suggestive of both schizophrenia and an affective/mood disorder. STEDMAN'S MEDICAL DICTIONARY 1578 (26th ed. 1995).

medications and had begun experiencing auditory hallucinations again, although she had restarted them just prior to the hospitalization. (Tr. 573.) She began to stabilize after a few days. (*Id.*) She began denying suicidal ideations by October 6, 2008 and was discharged. (Tr. 574.) She was prescribed Geodon, Klonopin, and Cymbalta.[12] (*Id.*)

Mills once again reported suicidal ideation on April 17, 2009, informing Gateway staff that the voices were talking to her again and she was having serious problems sleeping. (Tr. 957.) Her counselor at Gateway recommended that she voluntarily admit herself to Georgia Regional. (*Id.*) At Georgia Regional, she indicated that she was fully compliant with her medication regimen but was still suffering from serious depression and hearing voices, and she was fairly certain that without help she would make another attempt on her life. (Tr. 832.) The staff noted that her affect was flat, she was suffering from command hallucinations, and her suicide risk was high, so they admitted her for crisis stabilization. (Tr. 834.) She scored 25 on the modified Global

---

[12] Cymbalta, or duloxetine, is another SNRI. National Library of Medicine, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010059/ (last visited Apr. 17, 2004).

Assessment of Functioning Scale ("GAF"),[13] indicating an inability to function in almost all areas. (Tr. 837.) Staff members gave her a room and performed 15 minute checks on her until she was stabilized. (Tr. 875.) Her medication was adjusted, and she stayed in the hospital until April 23, 2009. (Tr. 878.) On her discharge paperwork at Georgia Regional, the attending physician, Dr. Jesus Ortiz, M.D., noted that it was her third episode at Georgia Regional, stated that her prognosis was guarded, assigned her a GAF of 71, and changed her diagnosis from "schizoaffective disorder bipolar" to "schizoaffective disorder manic with psychosis." (Tr. 825-26.) She was kept on Klonopin, Seroquel, Geodon, and Cymbalta, though her Seroquel dosage was increased. (*Id.*)

In a follow-up appointment with Gateway, Mills again arrived with a flat demeanor and noted that she was still hearing voices, which were worse at night. (Tr. 956.) The physician's assistant who met with her

---

[13] "GAF is the overall level at which an individual functions, including social, occupational, academic, and other areas of personal performance. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 30–32 (4th ed. 1994) ("DSM–IV"). It may be expressed as a numerical score. Id. at 32. A score between 51 and 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*" *Gray v. Colvin*, 2014 WL 1118105 at * 5 n. 15 (N.D. Fla. Mar. 20, 2014).

assigned her a GAF of 50 and adjusted her Geodon dosage. (*Id.*) At the next follow-up, she reported more of the same and noted that she was shaking. (Tr. 955.) The physician's assistant added Cogentin[14] into the mix and increased claimant's Geodon dosage. (*Id.*) Not long after, in October 2009, Mills had her gallbladder removed. For some time after, she seemed well controlled. (Tr. 953.) Her medication remained unchanged and her hallucinations were kept at bay for several months. (Tr. 951.) But in February 2010, she began hearing voices again, at times. (Tr. 1071.) In June of 2010, Mills again saw Dr. Ortiz. (Tr. 1068.) Her medications remained largely unchanged, but she still noted problems sleeping. (*Id.*)

There are no further treatment records, though there are 15 pages reflecting counseling sessions and medication checks that occurred through January 12, 2011, but without any corresponding treatment notes. (Tr. 1092-1106.) There are also several disability impairment evaluations.

---

[14] Cogentin is commonly used to treat Parkinson's disease. National Library of Medicine, *available at* http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0000225/ (last visited Apr. 23, 2014).

In November 2007, Mills had a two-hour psychological evaluation with Jeffrey Jennings, Ph.D., at the request of Georgia's Disability Adjudication Services. (Tr. 472.) He noted that she was prescribed Klonopin for anxiety, Effexor for depression, Seroquel for mood, and Ultram, Ibuprofen, and Celebrex for her knee pain and arthritis. (*Id.*) Since starting Effexor, she stated that she had visual hallucinations but was no longer hearing voices or having suicidal thoughts. (*Id.*) Nevertheless, Dr. Jennings later noted that "[s]he has preoccupying thoughts about suicide." (Tr. 473.) She reported to Jennings that she had attempted suicide 8 to 10 times and had been admitted to Georgia Regional twice. (Tr. 474.) Jennings noted that her history was not necessarily accurate, as it was self-reported, but he still saw no evidence of malingering, and noted that her IQ was below average and her GAF score was estimated at 60. (Tr. 473-74.) Though she alleged bipolar disorder and psychosis, he confirmed her diagnoses of major depression with psychotic features. (*Id.*)

In December 2007, Mark A. Williams, Ph.D., a non-examining psychologist, conducted a mental residual functional capacity ("RFC") assessment and concluded that claimant was only moderately limited in a

few functional areas. (Tr. 477.) He noted recurrent suicidal ideation and psychosis but found that there was not adequate medical substantiation, so she was "likely capable of simple work." (Tr. 491.) On September 10, 2008, another non-examining state consultant, Michael Carter, Ph.D., noted that it was unusual to develop psychotic symptoms at 41 and that Mills was only partially credible. He was especially troubled by the addition of visual hallucinations. He stated that she either had drug induced visual hallucinations or was engaged in "case promotion." (Tr. 568.)

On June 17, 2008, Dr. Gaston Loomis, a psychiatrist, noted that Mills had been under SABHC's care since April 2007 for schizoaffective disorder, bipolar type, and that despite her compliance with medication she has not achieved remission and could not work. "Her prognosis is guarded at this point and she has been advised to pursue disability." (Tr. 515.) He opined on February 5, 2010 (while at "Savannah Counseling Services, Inc.") that Mills had been receiving treatment at his office since February 2009 for schizoaffective bipolar disorder, and "[d]espite her compliance with her medications and multiple trials she has not fully

achieved remission of her symptoms" and was thus unable to go back to work. (Tr. 1019.)

On June 8, 2010, claimant met with Emil Karp, Ph.D., a state disability consultant, for another in-person psychological evaluation. (Tr. 1039.) She again reported visual hallucinations, stating that she saw "dead people" who told her "to do stuff." (Tr. 1039.) Her daughter, who drove her to the meeting, reported to Dr. Karp that claimant's personality would change from time to time and that she spent a large portion of her time driving her mother from appointment to appointment and generally taking care of her. (Tr. 1039-40.) During the interview, her affect was "highly constricted and basically flat. Her eye contact was poor. She seemed avolitional, and she never smiled." (Tr. 1040.) She also reported having panic attacks almost weekly, and she was otherwise at an incredibly low energy level. (Tr. 1041.)

Karp ultimately evaluated her as having a mood and panic disorder, not specified, but recognized the possibility that she suffered from schizoaffective bipolar or major depression with psychotic features. (Tr. 1043.) He found that her "ability to function is complicated by relatively low intellectual functioning, perceptual abnormalities,

depression, multiple forms of anxiety, forgetfulness, easy frustration and possible side-effects from prescribed medication." (*Id.*) Those problems hamper her ability to understand, remember, and carry out instructions and making judgments. (*Id.*) They also restrict her ability to interact with others. (*Id.*) Finally, with her history of suicide attempts, "it is possible that if stress is intense or prolonged, she would decompensate. Her prognosis seems guarded." (*Id.*) He assigned her marked limitations in making simple decisions, understanding and carrying out complex instructions, and making complex decisions. (Tr. 1044.) She was moderately impaired in her ability to understand and remember simple tasks or carry them out. (Tr. 1044.) Finally, she was moderately impaired in her ability to interact with any people in a work setting. (Tr. 1045.)

On June 9, 2010, Dr. Ortiz stated that in his opinion Mills could not return to work and is totally disabled. (Tr. 1048.) Another treating psychiatrist, Dr. Seleem Assad Sayyar, M.D., who completed an evaluation on January 6, 2011, stated that he had seen her for the first time on August 9, 2010. (Tr. 1083.) He diagnosed Mills as suffering from schizoaffective disorder, depressed type, and post-traumatic stress

disorder, chronic. (Tr. 1083.) He assigned her a current GAF of 45, gave her a "guarded" prognosis, and noted that she has chronic suicidal thoughts. (Tr. 1084.) He said he expected her to require hospitalization up to twice yearly. (Tr. 1085.) In addition to several mild and moderate limitations, he assigned her marked limitations in her ability to complete a normal workweek at a consistent pace and her ability to accept instruction and respond to criticism. (Tr. 1088.) He also noted that she would be likely to decompensate at work. (Tr. 1088.) At the time of writing, her medications had again changed as well. Now she was on a higher dose of Seroquel, along with Cymbalta and Cogentin, and she had been placed on another antidepressant, Trazedone. (Tr. 1088.) He estimated that she would be unable to work more than three times monthly. (Tr. 1090.)

## III. ANALYSIS

Mills claimed before the Commissioner that she could no longer work as of May 4, 2007 based upon her mental conditions, obesity, asthma, and bursitis of the right knee. (Tr. 38, 40.) The ALJ found that all of those conditions were "severe" at step two but none of them, individually or in combination, met a listed requirement at step three.

(Tr. 40-41.)  At step four, the ALJ held that Mills retained the residual

functional capacity ("RFC")

> to perform light work as defined in 20 CFR 404.1567(b) and
> 416.967(b), except no more than occasional balancing and climbing
> of ramps and stairs with no crawling or climbing of ladders, ropes,
> or scaffolding.  She should not perform crouching and crawling.
> She can rarely perform stooping.  She can stand and walk for a
> total of 3 hours during an eight-hour workday and continuously for
> one hour at a time.  She should avoid walking on uneven/rough
> terrain.  She can sit for a total of five hours during an eight-hour
> workday and for a total of 1-hour continuously.  She can
> occasionally use her right foot and frequently use her left foot to
> operate foot controls.  She can occasionally drive motor vehicles.
> She can perform occasional, bilateral grasping, handling, feeling
> and fine finger manipulation.  She can perform occasional reaching
> in all directions and overhead reaching.  No work at dangerous
> heights and no more than occasional exposure to dust, fumes,
> smoke, chemicals, noxious gases, wet and humid conditions, heavy
> vibrations, and dangerous moving machinery.  She can perform
> simple or lower end detailed work of a low stress nature, which
> does not require prolonged interpersonal interactions.  She must be
> allowed to take prescribed psychotropic medications, which
> reportedly are without reported side effects, to control
> schizoaffective auditory hallucinations.

(Tr. 47.)  After consulting with a vocational expert ("VE"), the ALJ

determined that Mills could not return to her past work but could

perform several light work jobs available in the national economy.  (Tr.

50-51.)  Mills challenges only the ALJ's evaluation of her mental

condition.

The Court's independent review of the record[15] reveals that the ALJ has misread or misconstrued material record evidence on several points, failed to recognize that mental disorders of the type presented by Mills are episodic in nature, and engaged in a hyper-technical, over-exacting, and largely unsupported analysis of her credibility. The ALJ also offers unconvincing reasons for his discounting of the treating physicians' opinions, and he has failed in his duty to create a complete record. [16]

## A.   Factual Errors

The ALJ repeatedly misrepresents the medical evidence of record. When such misrepresentations are material to the determination of the degree of impairment, a reviewing court cannot say that the ALJ conducted a careful and thorough review of the record or that his decision is based on substantial evidence. *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 825 (8th Cir. 2008). Such a misstatement of the record is a fundamental error that typically forces a remand to the Commissioner.

---

[15] District courts are required to conduct an independent and thorough review of the record as a whole. *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)

[16] Because Mills is correct that this case must be reversed, the Court will not address her claim that the ALJ erred by relying on flawed VE testimony. She may bring that to the attention of the Commissioner on remand.

*Allen v. Colvin*, 2014 WL 972188 at *12 (M.D. Pa. Mar. 12, 2014); *Hester v. Colvin*, 2014 WL 975588 at *2 (E.D.N.C. Mar. 12, 2014); *Morales v. Astrue*, 2012 WL 3291747 at *11 (M.D. Fla. Aug. 13, 2012); *Tyndall v. Astrue*, 2011 WL 4029398 at *11 (N.D. Fla. Aug. 11, 2011).

In his most glaring misrepresentation of the record, the ALJ utterly discounts plaintiff's September 2008 attempted suicide and misstates that there was no evidence of any prior thoughts of suicide. His entire treatment of the episode is as follows:

> On September 29, 2008, the claimant was admitted into Memorial Hospital after reportedly ingesting seven Seroquel. The claimant reported that the overdose resulted from recent events in her life including the breakup of a nineteen-year relationship . . . previously totally unreported in her medical records. *The undersigned notes claimant* [sic] *sudden revelation of a nineteen-year, long-term relationship is inconsistent with her allegations of social isolation and withdrawal.*

> She also alleged having auditory hallucinations telling her to harm herself (Exhibit 20-F). There is no evidence in claimant's mental health treatment notes of her having any suicidal thoughts prior to her *alleged* suicide attempt.

(Tr. 43 (emphasis in original, except as to "alleged").) First, the suicide attempt was more than "alleged," as a toxicologist reported to Mills' treating physician that Mills had taken a toxic dose, and she presented at the ER with an "acute respiratory failure" and required intubation to

save her life. (Tr. 572, 575.) Second, the record flatly contradicts the ALJ's suggestion that claimant did not truly have suicidal thoughts or depression prior to this "alleged" attempt. Indeed, the record is replete with examples of the rapid onset of command hallucinations and suicidal ideation prior to September 29, 2008. (Tr. 410-11 (during her March 29, 2007 hospital admission, Mills "confirmed auditory hallucinations directing her to kill herself"); tr. 444 (in April 2007, she confirmed hearing voices commanding her to slit her wrists and jump off the Talmadge Bridge); tr. 509 (in October 2007, Mills reported command hallucinations and suicidal ideation); tr. 640 (in February 2008 she complained of suicidal ideation and a physician suspected that she had attempted suicide by overdosing on Klonopin).[17]

The ALJ also misrepresents the record in stating that Mills showed no hint of anxiety prior to her November 2007 meeting with the state consultative psychologist, Dr. Jennings. (Tr. 41.) That is simply not the case. Not only did Jennings observe her showing "signs of anxiety" such as "nail biting and fidgeting," she frequently expressed worry and

---

[17] While the ALJ properly found Mills' admission of a 19-year "relationship" to be inconsistent with her claim of social isolation, he did not establish the exact nature or frequency of this relationship or point to any other evidence suggesting that, apart from this one contact, Mills was not substantially withdrawn from social intercourse.

anxiety prior to that evaluation. (Tr. 412 (at the March 29, 2007 hospitalization, she noted that she was "just feeling quite anxious"); tr. 413 (the examining physician at the hospital in March 2007, Dr. Willie Bowers, noted that "she does appear somewhat . . . anxious"); tr. 444 (during the April 27, 2007, SABHC "comprehensive psychiatric evaluation," a physician's assistant noted that prior to her hospitalization she was transported from work at the Georgia Ports Authority "due to paranoia and anxiety"); tr. 449 (October 7, 2007, treatment note reporting stress and worry from her constantly change living situation and her son's arrest); tr. 453 (June 19, 2007 treatment note showing that Mills presented as "worried" and not euthymic); tr. 507 (another treatment note recording non-euthymic, worried mood).) And after her meeting with Jennings, she was noted to present as anxious. (Tr. 508 (December 18, 2007 treatment note describing Mills' affect as "anxious").) In fact, Dr. Karp diagnosed her as suffering from multiple forms of anxiety. (Tr. 1043.)

The ALJ states that when claimant sought admission to Memorial's Clark Center with suicidal ideations on February 15, 2008, she later denied any suicidal thoughts when sent to the emergency room. (Tr. 42.)

Again, that is not the case. Mills admitted that she came because she was experiencing suicidal ideation. (Tr. 640 (the ER doctor reports that "[t]he patient states she keeps hearing voices that say, 'slit your wrists'").) What she denied was attempting to overdose on Klonopin. (Tr. 641 ("She states she has not ingested anything and has not attempted to kill herself.").) Dr. Pavlo, however, noted her belief that Mills may have taken such an overdose, as her urine tested positive for benzodiazepines and no other substances, Mills presented as "very tired and very sleepy," and she was hypotensive. (*Id.*)

The ALJ notes that while Mills reported to Dr. Jennings that she only experienced hallucinations when "severely" depressed, she later told her clinician in December 2007 that she was experiencing command hallucinations and the clinician did not note an increase in depression. (Tr. 42.) The ALJ treats this discrepancy as evidence of deception. The clinician, however, explicitly noted that Mills appeared to be depressed and anxious, with tangential thoughts and suicidal command hallucinations. (Tr. 508.) The ALJ, therefore, has engaged in a strained reading of the record, discounting any report of hallucinations unless the

treating clinician happened to note the magic word "severe" when mentioning that Mills claimed or showed signs of depression.

An ALJ may not rest a non-disability finding upon a material misstatement of the record. Here, the ALJ's recounting of the record is fundamentally flawed, for he continually misrepresents the medical evidence as to factual matters that have a material bearing upon the nature and seriousness of Mills' condition. Where a reviewing court has serious reservations whether the Commissioner has fairly and accurately evaluated the entire record, a remand is required. *See Scott ex rel. Scott*, 529 F.3d at 825 (remand appropriate where court's review of the record led it to seriously question whether the ALJ satisfied his duty to evaluate the entire record).

### B.    Episodic Mental Disorders

In all psychotic-type mental diseases "[c]ontinuous psychosis is rare.    In fact, many schizophrenics go into temporary periods of remission" whether on or off medication. CAROLYN A. KUBITSCHEK & JON C. DUBIN, SOCIAL SECURITY DISABILITY LAW AND PROCEDURE IN FEDERAL COURT § 5:24 (2013 ed.); *cf McGee v. Bowen*, 647 F. Supp. 1238, 1251 (N.D. Ill. 1986) ("Evidence that a mentally impaired claimant has periods

of remission from symptoms is relevant to the severity of the impairment, but does not itself determine how long the impairment is likely to last."). Major depressive "affect" disorders (i.e., mood/non-psychotic disorders) are also episodic. KUBITSCHEK § 5:25. Hence, "[i]t is improper to 'cherry pick' a single day mental health treatment note to support rejection of an overall longitudinal assessment of a claimant's mental functional limitations and it also 'reflects a fundamental, but regrettably all-too-common, misunderstanding of mental illness." KUBITSCHEK § 5:25 (quoting *Punzio v. Astrue*, 630 F.3d 704, 710-11 (7th Cir. 2011)).

The medical evidence of record reflects that Mills has experienced several distinct mental health episodes, as reflected by her multiple hospitalizations for recurrent suicidal ideation. Mills' medical sources also accepted without question that her mental problems are episodic and that stress and depression worsen her symptoms. Doctors Sayyar, Karp, and state non-examining consultant Dr. Williams even point out that extended decompensation is a distinct possibility if claimant is

exposed to stress.[18]   (Tr. 1088 (Sayyar); tr. 1043 (Karp); tr. 489 (Williams).).

At the outset of his analysis, the ALJ suggests that any diagnosis of psychosis would be an error when Mills is not actively experiencing psychotic symptoms.  (Tr. 42.)  He notes that when Mills "was *off* her medications for some weeks" she suffered no symptoms.  (Tr. 41.)  He surmises that the diagnosis at that time, major depressive disorder with psychotic features, could not be correct since she was not psychotic on an occasion when she was not medicated: "why [is she diagnosed with depressive disorder with psychotic symptoms] if she is no longer hallucinating, even off her medications?"  (*Id.*)  That reasoning fails to appreciate the episodic nature of such disorders, and it disregards much of the medical record.  The ALJ has attempted to interpose his own diagnosis based upon nothing more than his conjecture that the psychotic episode was truly a one-time occurrence, but he has not

_____

[18] According to the Listings, decompensation is defined as "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." *See* 20 CFR Part 404, Subpart P, App'x 1.

pointed to any record evidence supporting his supposition, and his own decision seemingly contradicts it.

The ALJ's conclusion that Mills' symptoms were well controlled on medication is also suspect, as it was based upon a few favorable treatment notes. "By June of 2007, claimant reported her auditory hallucinations had resolved and she noted improvement in her mood." (Tr. 40.) He represents that "she responds well to treatment and . . . her symptoms of depression and auditory hallucinations can be controlled when treatment is followed."[19] (Tr. 41.) He points to two more treatment notes in 2010 showing her hallucinations were resolved and "she is described as doing good." (Tr. 45.) While it is true that Mills frequently experienced some level of remission, the medical evidence does not support the ALJ's conclusion that her medication was a magic curative and that compliance would keep all of her symptoms well under control. On several occasions she experienced auditory command hallucinations when fully compliant with her medication regimen. (Tr.

---

[19] The ALJ also represents that she had no medication induced side effects, yet she often appeared to be excessively tired, dull, and listless. Dr. Karp even noted that her poor testing performance could be attributed to "side effects from her medication." (Tr. 1042.) And the treatment notes show that some of her medications caused galactorrhea, a white, milky discharge from the nipples. (Tr. 451); STEDMAN'S MEDICAL DICTIONARY 699 (26th ed. 1995).

450 (August 2007 treatment notes); tr. 508 (December 2007 treatment notes showing that she was hallucinating, experienced tremors, depression, paranoia, and expressed tangential, non-goal-directed thinking); tr. 832 (2009 hospitalization for depression, suicidal ideation, and command hallucinations while fully compliant with her medication regimen).)  Moreover, the record is replete with notes suggesting that, despite her medication, the affective side of her mental impairment caused changing moods from elevated to depressed, and gave rise to tangential, paranoid, and suicidal thought content.  (Tr. 508, 513 (depressed, tearful, paranoid), 514, 521 (bright, talkative, elevated), 523 (tangential thoughts, lack of focus), 692 (flat effect, soft speech, paranoid), 693 (disoriented), 719 (experiences mood swings), 721 (constant rocking), 941 (thinks people talk about her behind her back), 942 (poor concentration).)

The ALJ's cherry-picking of the evidence, when considered in light of his obvious confusion as to the nature of the diagnosed diseases and their symptoms, warrants a remand.  *Sarchet v. Chater*, 78 F.3d 305, 307-09 (7th Cir. 1996).

## C.  Credibility Determination

The ALJ's credibility determination is similarly flawed.[20]  He repeatedly relies upon minor, incidental factual errors and misstatements in evaluating Mills' credibility.  Those suffering from psychotic and affect disorders, however, are notoriously bad at delivering consistent, detailed, and error-free factual narratives.  KUBITSCHEK § 5:24 (where a claimant is psychotic, the ALJ should be particularly careful not to ascribe an inability to maintain consistency in responding to different medical personnel as an intention to deceive or to otherwise render an adverse credibility finding on that basis).  Consequently, ALJs

---

[20] When a claimant attempts to establish disability through his or her own testimony of subjective pain, the "pain standard" applies. *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). The pain standard demands:

> (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). When coupled with medical evidence which satisfies the pain standard, a claimant's testimony of subjective pain is, in and of itself, sufficient to sustain a disability determination. *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987). If the ALJ decides to discredit the claimant's testimony, he or she must "articulate explicit and adequate reasons" for doing so. *Id.* The ALJ's finding as to credibility, however, need not be explicit.  *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir. 1983). The implication, though, "must be obvious to the reviewing court." *Id.*

are cautioned not to overly "rely upon trivial inconsistencies in the testimony as the basis for negative credibility findings" when evaluating the credibility of someone with such a mental disorder. *Id.* at § 6:32.

The ALJ makes much of Mills' report that she did not consume alcohol, since she later revealed that she actually had consumed a small amount (a glass of wine on occasion) over the past several years. (Tr. 41.) Such an inconsistency is not immaterial to the credibility calculus, but it is not so momentous an inconsistency as the ALJ infers. He also makes too much of the fact that Mills reported that she had been admitted to Georgia Regional after her February 15, 2008 emergency room visit, when after her transfer to that facility "she was evaluated and discharged, *without admission.*" (Tr. 42 (emphasis in original).) The record reflects that following her transfer to Georgia Regional from the ER, she saw a doctor and was not released until later that day. Many patients might view even this brief period of treatment at a mental health facility as an "admission." In addition to being unusually fussy and legalistic about such small details, the ALJ faults claimant for reporting "that she dropped out of school in the 10th grade because she was pregnant, but now alleges that she received her GED." (Tr. 44.)

These two statements are not contradictory, and the Court is perplexed as to why the ALJ believed them to be so.

The ALJ also repeatedly suggests that Mills' occasional remissions undercut her credibility. (Tr. 41, 42, 43, & 45.) But the episodic nature of her mental disease is unquestioned by any of the medical experts who treated or examined her, and not one of those experts viewed her repeated hospitalizations, her reliance upon powerful psychotropic pharmaceuticals, or her documented suicide attempt and continual thoughts of suicide as some form of malingering. The fact that Mills was sometimes stable does not serve as a potent refutation of her credibility.

While weighing of the evidence is reserved to the Commissioner, it was not proper for the ALJ to focus upon such minor misstatements and hyper-technical distinctions in evaluating Mills' credibility. That is especially true in a case like this, where the ALJ's basis for discrediting the opinions of almost every treating and examining physician was his determination that claimant's subjective reports to her doctors and clinicians were entirely incredible. (Tr. 40-45.) Even as to Dr. Karp, the state consultative examiner, the ALJ states: "the good doctor made the fatal mistake of sometimes believing what claimant was telling him...

without checking out each statement meticulously." (Tr. 45.) The Court cannot fault the ALJ for finding some case promotion.[21] But his overzealous reliance upon trivial factual errors in concluding "that she changes her tale more often than most people change their socks" -- a statement not supported by the record -- was error.

## D. Treating Physicians

Not only does the ALJ suggest that any psychotic diagnosis should be ruled out since Mills failed to experience psychotic episodes for a brief time after stopping her medications, he characterizes a physician assistant's later diagnosis of bipolar-type schizoaffective disorder as "hapless," since it was based on subjective reports, while none of her records show any clinical observation of hallucinations or of any display of psychotic or manic episodes.[22] (Tr. 41-42.) But all of claimant's

---

[21] For example, the ALJ asserts that claimant misrepresented to Dr. Jennings that she had a diagnosis of bipolar disorder and psychosis. (Tr. 41.) It is true that her treatment notes prior to seeing Jennings did not reflect a diagnosis that she was bipolar, although she *was* later diagnosed as having bipolar-type schizoaffective disorder. (Tr. 474.) He then takes issue with her representation to Jennings that she had taken a handful of pills before her first hospitalization for suicidal thoughts in March 2007. (Tr. 41.) The ALJ is correct that she only reported suicidal ideation upon admission, not an actual suicide attempt. (Tr. 412.)

[22] The ALJ correctly notes that the assistant's diagnosis is not considered medical evidence under the Social Security regulations, but the diagnosis, or one similar to it, was confirmed on several occasions by treating physicians.

32

treating physicians, including Doctors Yost, Ortiz, Loomis, and Sayyar, eventually settled upon some form of psychotic schizoaffective disorder after working through bipolar type, manic type, and others.[23]  (Tr. 515, 572, 1019, 1048, & 1083.)  Doctor Karp, a consulting state psychologist,

---

[23] An ALJ must accord substantial weight to the opinion, diagnosis, and medical evidence of a treating physician unless there is good cause to do otherwise. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d at 583; 20 C.F.R. § 404.1527(d); *Farkas v. Astrue*, 2012 WL 750547 at * 6 (M.D. Fla. Mar. 8, 2012).

> "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1240–41 (11th Cir. 2004).  Therefore, if a treating physician's opinion on the nature and severity of a claimant's impairments is well supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2).

*Farkas*, 2012 WL 750547 at * 6. If the ALJ fails to state specifically what weight he assigned to physician sources, the error is harmless if his opinion is otherwise supported by substantial evidence.  *Murray v. Astrue*, 2012 WL 1424888 at * 7 (N.D. Ala. Apr. 24, 2012). As for non-examining physicians:

> Social Security Regulations require that an ALJ consider the opinions of non-examining physicians. 20 C.F.R. § 404.1527(f). The weight that should be assigned to a non-examining physician's opinion "depends, among other things, on the extent to which it is supported by clinical findings and is consistent with other evidence." *Jarrett v. Comm'r of Soc. Sec.*, 422 Fed. Appx. 869, 873 (11th Cir. 2011); *see also Oldham v. Schweiker*, 660 F.2d 1078, 1084 (Former 5th Cir. Unit B Nov. 1981) ("The law is clear that, although the opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician, the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion.").

*Id.* at * 9.

diagnosed her with non-specified mood and panic disorders but could not rule out some sort of psychotic disorder. (Tr. 1043.) Even non-examining consultant Michael Carter, Ph.D., accepted a diagnosis of either major depressive disorder with psychosis or a schizoaffective disorder, with some reservations. (Tr. 559.) And there were multiple treatment notes suggesting that claimant's mood changed drastically with some frequency. (Tr. 508, 513 (depressed, tearful, paranoid), 514, 521 (bright, talkative, elevated), 523 (tangential thoughts, lack of focus), 692 (flat effect, soft speech, paranoid), 719 (experiences mood swings), 721 (constant rocking).)

Putting the diagnosis issue to the side, the ALJ's refutation of the medical opinions as to Mills' limitations largely relies upon his somewhat dubious credibility determination. He never points to any medical opinion suggesting that claimant *is not* severely disabled by her mental condition.[24] The Commissioner now relies upon the opinion of non-examining state agency consultant Carter, but the ALJ never once

---

[24] The Court is not suggesting that the Commissioner bears the burden of proof. But in light of Mills' treatment records and the treating physicians' general agreement as to her limitations, it is difficult to see why he failed to discuss any countervailing medical evidence.

explicitly referenced Carter's RFC assessment in his decision.[25] (Doc. 12 at 5.) Nor did he weigh (or mention) non-examining state agency consultant Mark Williams' assessment, which unlike Carter's, found that claimant is likely to experience periods of decompensation and has more than mild restrictions of daily living. (Tr. 486.) If it was The ALJ's intention to rely on a single non-examining state agency consultant, the Court is forced to guess at his reasoning, since he never took the time to weigh that assessment against the contrary opinions of virtually every treating and examining medical source.

## E.    Duty to Develop Record

The ALJ discounted Dr. Sayyar's treating source report because "the evidence fails to show that he actually examined or saw the claimant." (Tr. 45.) Dr. Sayyar himself says that he saw the patient. (Tr. 1083.) While the treatment notes from the clinic ended on June 9, 2010, before Sayyar began treating Mills, there were 15 separate visits *after* June 2010, but the ALJ made no effort to obtain the actual treatment notes. (Tr. 1092-1106.) It is the ALJ's "duty to develop the

---

[25] Carter's assessment also pre-dated Mills' suicide attempt. (Tr. 556 (assessment was made on September 10, 2008).)

record fully and fairly." *Wilson v. Apfel*, 179 F.3d 1276, 1278 (11th Cir. 1999). He neglected this duty by failing to contact Sayyar and seeking the medical evidence supporting his evaluation. *E.g., Ybarra v. Astrue*, 2009 WL 3162240 at *8 (D. Colo. Sept. 30, 2009) (citing *Maes v. Astrue*, 522 F.3d 1093 (10th Cir. 2008), and *McGoffin v. Barnhart*, 288 F.3d 1248 (10th Cir. 2002)).

## III. CONCLUSION

The ALJ's decision is remarkable for its caustically dismissive style, and in many respects it reads like a letter to a friend rather than a studied legal opinion. The Court has never seen anything quite like it. But it is the decision's substance, not its sophomoric style, that is so problematical as to require remand. Where, as here, an ALJ plainly misapprehends or misrepresents the record in making his factual and credibility findings, and where, as here, those erroneous findings are material to the ultimate determination of disability, then the ALJ's decision cannot be said to rest upon substantial evidence.

Accordingly, the Court should reverse the Commissioner's decision under sentence four of 42 U.S.C. § 405(g) and remand the action for further consideration. *See Shalala v. Schaefer*, 509 U.S. 292, 296-97

(1993). The clerk of court should be directed to enter a separate judgment pursuant to Federal Rule of Civil Procedure 58.

**SO REPORTED AND RECOMMENDED** this  25th  day of April, 2014.

_____
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA